**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**



**L-3 COMMUNICATIONS**

**and**

**INSURANCE COMPANY OF THE STATE**
**OF PENNSYLVANIA,**

    **Petitioners,**

**v.**                                                    **Civil Action No. 2:10cv592**

**DIRECTOR, OFFICE OF WORKERS'**
**COMPENSATION PROGRAMS**

**and**

**MICHAEL SCHBOT,**

    **Respondents.**

## OPINION AND ORDER

This matter is currently before the Court on appeal by L-3 Communications ("Employer") and the Insurance Company of the State of Pennsylvania (collectively "Petitioners" or "Employer/Carrier"). These Petitioners appeal from the Decision and Order ("BRB D&O") of the United States Department of Labor Benefits Review Board ("BRB") affirming the Decision and Order ("ALJ D&O") of Administrative Law Judge ("ALJ") Daniel F. Solomon. The ALJ D&O awarded Michael Schbot ("Respondent" or "Employee") benefits stemming from a work-related injury occurring on January 22, 2007, in Iraq. The award of benefits

was made under the Defense Base Act ("DBA"), 42 U.S.C. § 1651 *et seq.*, which is an extension of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*

Although there is a lack of uniformity across circuits on the issue of whether BRB appeals should be heard by a district court or a circuit court, in this circuit appeals of BRB decisions under the DBA should be initiated in the <u>district court</u> where the deputy commissioner's office is located. <u>Compare</u> <u>Lee v. Boeing Co., Inc.</u>, 123 F.3d 801, 803-06 (4th Cir. 1997); <u>with</u> <u>Serv. Emps. Int'l, Inc. v. Director, OWCP [Barrios]</u>, 595 F.3d 447, 451-55 (2nd Cir. 2010). Because the deputy commissioner's compensation order originated in this judicial district, the appeal was properly filed here. Compl. Ex. B, Docket No. 1.

Petitioners' appeal raises two challenges to the BRB D&O. First, Petitioners allege that the BRB erred by affirming the ALJ's use of Respondent's post-injury wages to calculate an average weekly wage. Pet'rs' Mem. 2. Second, Petitioners assert that the BRB erred in affirming the ALJ's calculation of Respondent's post-injury earning capacity, arguing that the award is excessive. Pet'rs' Mem. 2. Petitioners base their second argument on two contentions: 1) the ALJ should not have disqualified an interpreter position as suitable alternative employment for purposes of calculating Respondent's post-injury

2

earning capacity; and 2) the ALJ failed to average the salaries of positions identified as suitable alternative employment. Id. at 19-20.

## I. HISTORY OF THE DBA

Congress enacted the DBA in 1941 in order to "provide[] workers' compensation coverage for certain employees working outside the continental United States at military bases or on other national defense projects." Lee, 123 F.3d at 804 (citing 42 U.S.C. § 1651). The DBA "was adopted at the request of the Secretary of War to prevent the conflicts in compensation coverage for overseas employees presented by numerous state workers' compensation laws and to enable the United States government and its defense contractors to avoid the substantial cost of obtaining tort liability insurance coverage for the identified classes of overseas employees." Levy, Defense Base Act and War Hazard's Compensation Act Handbook, ch. 10, § 10.01 (Matthew Bender) (citing Republic Aviation Corp. v. Lowe, 69 F. Supp. 472 (S.D.N.Y. 1946), aff'd, 164 F.2d 18 (2nd Cir. 1947), cert. denied, 333 U.S. 845 (1948). The DBA extended the provisions of the LHWCA to employees working on federal installations abroad. See 42 U.S.C. § 1651(a) ("Except as herein modified, the provisions of the [LHWCA] as amended, shall apply in respect to the injury or death of any employee engaged in any [covered] employment."). Thus, the provisions of the

3

LHWCA govern DBA cases, unless a provision of the DBA provides otherwise. <u>See</u> <u>Lee</u>, 123 F.3d at 804 (citing <u>AFIA/CIGNA Worldwide v. Felkner</u>, 930 F.2d 1111, 1113 (5th Cir. 1991)).

When Congress enacted the DBA, the LHWCA mandated judicial review of LHWCA administrative orders in the federal district courts of the district where the injury occurred. <u>Id.</u> (citing 33 U.S.C. § 921(b) (1970), <u>amended by</u> 33 U.S.C. § 921(c) (1972)). "Since the DBA applies only to overseas sites, however, the injury in DBA cases could not possibly occur within any federal judicial district." <u>Id.</u> Congress, therefore, provided that "[j]udicial proceedings . . . in respect to a compensation order made pursuant to [the DBA] shall be instituted in the United States district court of the judicial district wherein is located the office of the deputy commissioner whose compensation order is involved . . . ." 42 U.S.C. § 1653(b).

Congress amended the LHWCA in 1972 and created the judicial review procedures now in existence for appeals of ALJ orders. <u>Lee</u>, 123 F.3d at 804. "Thus, the procedures described in the LHWCA for filing a claim, obtaining an administrative determination by an ALJ, and initially appealing the ALJ's decision to the [BRB] are exactly the same in LHWCA and DBA cases." <u>Id.</u> (citing <u>Felkner</u>, 930 F.2d at 1113-15). However, Congress changed the judicial review procedure for compensation

4

awards under the LHWCA to provide direct review of BRB orders in the federal appellate court in the circuit where the injury occurred. Id. (citing 33 U.S.C. § 921(c)). Congress did not make a similar change to the DBA. Id. at 805. Accordingly, 42 U.S.C. § 1653(b) still governs DBA cases, meaning that in this circuit review of BRB orders under the DBA occurs at the federal district court level. Lee, 123 F.3d at 805-06.

## II. FACTS AND PROCEDURAL HISTORY

The Employer hired Respondent as a linguistic specialist/translator in November of 2006. ALJ D&O 2. Respondent was an "at will" employee whose "initial assignment [was] expected to last approximately one year," as reflected in the Employer's December 13, 2006 Offer Letter signed by Respondent on December 14, 2006. Id. at 26 (citing Ex. 4, at 4). The Employer's personnel file on Respondent contains a Service Agreement (incorporating the Offer Letter) signed by Respondent, though only the odd-numbered pages are part of the file provided to the Court. This Service Agreement was also dated December 14, 2006, and refers to the "contract under which you are working." Ex. 4, at 13. It further states that the "work may take place in a combat zone or other dangerous environment." Id.

After testing and processing in Reston, Virginia, Respondent went to Georgia for further testing. ALJ D&O 2.

Respondent then traveled to Kuwait, and on to Iraq to work as an Arabic/English translator for the U.S. Army.  Id.  Respondent, who testified that he thought he would only be translating documents, was immediately sent "outside the wire" in Iraq to translate for captured insurgents.  Id.  "On the night of January 21, [2007,] while working for the Employer in Fallujah, Iraq, the claimant injured himself walking from his tent to the bathroom when he slipped and fell on a pallet."  Id.  After spending the night in severe pain, Respondent reported the injury the next morning and was seen by a nurse.  Schbot v. L-3 Commc'ns, BRB No. 10-0327, 2010 WL 4035105, at *1 (Ben. Rev. Bd. Sept. 30, 2010).  The following day Respondent went on a week-long mission, "which required extensive walking on uneven terrain while wearing 35-pound body armor and carrying a 15-pound backpack."  Id.  After this mission, Respondent suffered from pain in his back, legs, shoulder, and hip.  Id.  Upon return from the week-long mission, Respondent saw a physician in Fallujah who prescribed pain killers and muscle relaxers.  Id.  Following this medical treatment, Respondent continued to work as a translator, translating documents and assisting in the questioning of captured insurgents in the Fallujah jail; he even went on another week-long patrol mission.  Id.  A physician subsequently restricted his participation in the patrol missions, but Respondent continued to work in the Fallujah jail.

6

Id.  Respondent was later sent to Baghdad for treatment, where an Army physician x-rayed his back.  Id.  Physicians concluded they could do nothing more for Respondent in Iraq, so he was sent back to the United States for treatment.  Id.  Reviewing physicians in the United States concluded that Respondent should not be sent back to Iraq due to his ongoing back pain.  Id. Respondent subsequently sought compensation under the DBA.  Id.

The ALJ D&O was issued on July 2, 2009.  The ALJ determined that Respondent established invocation of the 33 U.S.C. § 920(a) presumption that he had sustained a workplace injury on January 22, 2007, and Petitioners did not rebut the presumption.  Id. The ALJ concluded that Respondent had reached maximum medical improvement on August 27, 2008, and that Respondent could not return to his former duties in Iraq.  Id.  The Petitioners established suitable alternative employment for Respondent through an August 25, 2008 labor market survey.  Id.  Without objection from the Employer/Carrier, the ALJ then used 33 U.S.C. § 910(c) to calculate Respondent's average weekly wage, concluding "that there is no evidence that claimant would not have fulfilled his obligation under the employment contract with employer absent his injury."  Id.  The ALJ divided Respondent's 2007 wages with Employer of $32,730.44 by the number of weeks he was paid, fifteen, to determine an average weekly wage for Respondent in the amount of $2,182.03.  Id.  Then, the ALJ

determined that Respondent's post-injury wage-earning capacity was $576.92, based on the lowest salary of the positions identified as suitable alternative employment. Id. The ALJ awarded Respondent temporary total disability benefits from March 23, 2007, to August 24, 2008; temporary partial disability benefits from August 25-26, 2008; and ongoing permanent partial disability benefits from August 27, 2008. Id. (citing 33 U.S.C. § 908(b), (c)(21), (e)).

Petitioners moved for the ALJ to reconsider his opinion, contending that the ALJ should not have used Respondent's post-injury wages in the calculation of average weekly wage, but the ALJ denied this motion on December 30, 2009. Id. at *3. In doing so, the ALJ noted that the Respondent received a higher salary in Iraq than he would have in the United States because he was working in a "dangerous environment" while in Iraq, and that his prior stateside work history and wage history were not comparable to his work and wages in Iraq. Id. at *2-3. Petitioners subsequently appealed the ALJ's order to the BRB, again arguing that the ALJ erred by using Respondent's post-injury wages in his calculation of Respondent's average weekly wage. Id. Petitioners contended that Respondent's "overseas wages for the 16 days prior to the accident yield an average weekly wage of $1,671.89." Id. Petitioners also alleged that the ALJ erred in his calculation of Respondent's post-injury

earning capacity by disqualifying an interpreter position as suitable alternative employment and by using only the salary of the lowest-paying position identified as suitable alternative employment in his calculation. Id. The BRB affirmed the decision of the ALJ, concluding that the ALJ's determinations were reasonable and based on substantial evidence. See id. at *3-5.

Petitioners have appealed the BRB's decision to this Court, contending that the BRB erred in affirming the ALJ. Petitioners raise the same arguments in this Court as those considered by the BRB.

### III. STANDARD OF REVIEW

In reviewing the decision of the BRB, this Court applies the same standard of review as the BRB uses in reviewing the decision of the ALJ: "[T]he ALJ's findings of fact [are] deemed 'conclusive if supported by substantial evidence in the record considered as a whole.'"[1] Newport News Shipbuilding & Dry Dock Co. v. Parker, 935 F.2d 20, 22 (4th Cir. 1991) (quoting 33

---

[1] Nothing in the DBA alters or modifies the standard of review in a judicial proceeding for review of a LHWCA compensation award. Thus, the standard of review in DBA cases is the same as the standard in a LHWCA case. In fact, the Supreme Court has explained that judicial review of all "record-based factual conclusion[s]" of an agency is under the substantial evidence standard. Dickinson v. Zurko, 527 U.S. 150, 164 (1999) (citing SEC v. Chenery Corp., 318 U.S. 80, 89-93 (1943)).

U.S.C. § 921(b)(3); <u>Newport News Shipbuilding & Dry Dock v. Dir., OWCP</u>, 681 F.2d 938, 941 (4th Cir. 1982)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Parker</u>, 935 F.2d at 22 (quoting <u>Consol. Edison v. NLRB</u>, 305 U.S. 197, 229 (1938)).  This Court reviews the decision of the BRB to "assure that the Board adhered to its statutory standard of review, i.e. whether the administrative law judge's findings of fact are supported by substantial evidence." <u>Marathon Oil Co. v. Lunsford</u>, 733 F.2d 1139, 1141 (5th Cir. 1984) (cited with approval in <u>Parker</u>, 935 F.2d at 23).  This Court also has plenary authority to correct errors of law. <u>Parker</u>, 935 F.2d at 23 (citing <u>Dir., OWCP v. Consol. Coal Co.</u>, 884 F.2d 926, 929 (6th Cir. 1989)).[2]

---

[2]In this circuit, "[t]he Board's adjudicatory interpretation of the LHWCA is entitled to no special deference, and is subject to [the Court's] independent review." <u>Pittman Mechanical Contractors v. Dir., OWCP</u>, 35 F.3d 122, 125 (4th Cir. 1994). "However, absent clear congressional intent to the contrary, we do afford deference to a reasonable construction of the LHWCA by the Director, Office of Workers' Compensation Programs (Director), because he has policymaking authority with regard to the Act." <u>Id.</u> The Director filed no substantive brief in this case, and therefore this Court has no construction to which it should arguably defer.

## IV. DISCUSSION

### A. Calculating Respondent's Average Weekly Wage

The LHWCA, and by extension the DBA, provides three different methods for calculating an injured employee's average weekly wage. See 33 U.S.C. § 910(a)-(c). In this case the ALJ applied section 910(c),[3] and "[t]he parties do not contest the [ALJ]'s finding that subsections (a) and (b) are inapplicable in the instant case." Schbot, 2010 WL 4035105, at *2 n.1 (citing Proffitt v. Serv. Emp'rs Int'l, Inc., 40 BRBS 41, 2006 WL 2604890 (Aug. 14, 2006)). Rather, Petitioners find fault in the ALJ's calculation of Respondent's average weekly wage, which was based solely on Respondent's pre and post-injury wages with Employer in Iraq, because the ALJ took into account Respondent's post-injury wages. Pet'rs' Mem. 7-8. Petitioners assert that the "prime objective of Section 910(c) is to arrive at a sum

---

[3] Section 910(c) provides:

> If either of the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.

33 U.S.C. § 910(c).

11

that reasonably represents a claimant's annual earning capacity at the time of injury," and that post-injury wages should not be considered.  Pet'rs' Mem. 9 (citing Cummins v. Todd Shipyards, 12 BRBS 283, 285 (1980); Universal Mar. Serv. Corp. v. Wright, 155 F.3d 311, 329 (4th Cir. 1998)).

In affirming the ALJ D&O, the BRB first noted that it is true that "[t]he object of Section 10(c) is to arrive at a sum that reasonably represents claimant's annual earning capacity at the time of his injury."  Schbot, 2010 WL 4035105, at *2 (citing Bath Iron Works Corp. v. Preston, 380 F.3d 597 (1st Cir. 2004); Empire United Stevedores v. Gatlin, 936 F.2d 819 (5th Cir. 1991)).  The BRB went on to observe that "[t]his inquiry includes consideration of claimant's ability, willingness and opportunity to work and the earnings claimant had the potential to earn had he not been injured."  Id.  (citing Tri-State Terminals, Inc. v. Jesse, 596 F.2d 752 (7th Cir. 1979); Jackson v. Potomac Temporaries, 12 BRBS 410 (1980)) (emphasis added).

Petitioners assert that § 10(c)'s use of the phrase "at the time of injury" means that "'post-injury events are generally irrelevant.'"  Pet'rs' Mem. 10 (quoting Hawthorne v. Ingalls Shipbuilding Inc., 28 BRBS 73, 79 (1994)).  They further note that "'[t]he plain meaning of the statute accords with common sense:  the time of injury means the time of the event causing injury.'"  Pet'rs' Mem. 12 (quoting LeBlanc v. Cooper/T. Smith

12

Stevedoring, Inc., 130 F.3d 157, 161 (5th Cir. 1997)). They go on to assert that "'[t]his provision [mandating calculation at the time of injury] is mandatory; it should not be amended by administrative decision.'" Pet'rs' Mem. 16 (quoting Dir., OWCP v. Gen. Dynamics Corp., 769 F.2d 66, 68 (2d Cir. 1985) (internal citations omitted)). Though Petitioners recognize that a "limited exception" to this rule applies in "exceptional circumstances," they claim there are no such exceptional circumstances here. Pet'rs' Mem. 12. Accordingly, Petitioners contend that the ALJ erred by taking into account the wages of Respondent past the January 22, 2007 date of injury. Pet'rs' Mem. 11-17.

Respondent, on the other hand, asserts that the ALJ properly considered Respondent's post-injury wages in the calculation of his average weekly wage. Resp't's Mem. 8-14. Respondent first notes that the purpose of Section 910(c) is "'to reflect the potential of claimant's ability to earn.'" Resp't's Mem. 9 (quoting Proffitt, 40 BRBS 41, 2006 WL 2604890). Respondent also adopts the Seventh Circuit's position that "[t]he Board's interpretation of [Section] 10(c) thus construes earning capacity of the injured workman to mean the amount of earnings the claimant would have the potential and opportunity to earn absent injury." Tri-State Terminals, 596 F.2d at 757 (emphasis added). Respondent further points out that the ALJ

13

"has the discretion, in appropriate cases, to consider circumstances existing after the date of injury where previous earnings do not realistically reflect claimant's wage-earning potential." Resp't's Mem. 13 (citing Tri-State Terminals, 596 F.2d at 752; Walker v. Wash. Metro. Transit Auth., 793 F.2d 319 (D.C. Cir. 1986); S.K. v. Serv. Emp'rs Int'l Inc., BRB Nos. 06-0591 & 07-0710, 41 BRBS 123, 2007 WL 4282166 (Sept. 28, 2007)).

Petitioners rely heavily upon the holdings from LeBlanc, General Dynamics, and McKnight v. Carolina Shipping Co., 32 BRBS 165, 1998 WL 461479 (July 10, 1998), and claim that they stand for the proposition that the ALJ cannot consider an injured worker's post-injury wages, absent limited exceptional circumstances. Pet'rs' Mem. 11-17. However, these cases involved employees that applied for disability years after a workplace accident.[4] For example, in LeBlanc, claimant fell from a ship ladder in 1987, injuring his lower back. 130 F.3d at 158. Claimant returned to work a couple of months later. Id. at 158-59. In April 1992 claimant was diagnosed with a degenerative disease, and the treating physician identified

---

[4]It should also be noted that these cases involved interpretations of 33 U.S.C. § 910(i), which specifically states that for compensation claims under the LHWCA (or, by extension the DBA), "due to an occupational disease which does not immediately result in death or disability, the time of injury shall be deemed to be the date on which the employee or claimant becomes aware . . . of the relationship between the employment, the disease, and the death or disability." 33 U.S.C. § 910(i).

claimant's workplace accident, and continued work as a longshoreman, as the cause of the disease. Id. Claimant's average weekly wage in 1987 was $92.87, but his average weekly wage in 1992 was $439.65. Id. at 158-59. Claimant filed for disability, but the ALJ determined that his residual earning capacity was greater than his average weekly wage at the time of the accident, meaning that he was not entitled to compensation. Id. at 159. The United States Court of Appeals for the Fifth Circuit affirmed the ALJ's use of claimant's 1987 average weekly wage in the case because the court refused to "read a 'time of manifestation' exception into the LHWCA . . . ." Id. at 161.

In General Dynamics, claimant slipped on the icy deck of a submarine in 1970. 769 F.2d at 67. Claimant twisted his left knee, resulting in a torn meniscus. Id. The torn meniscus was surgically removed, and the employer made a lump-sum payment based on claimant's 1970 average weekly wage. Id. In 1979 claimant filed for disability because he had developed arthritis as a result of the slip and the surgery. Id. The ALJ determined that claimant's average weekly wage should be based on claimant's 1979 wages because the injury manifested itself years after the original injury. Id. The United States Court of Appeals for the Second Circuit disagreed, determining that since claimant's injury occurred in 1970, the ALJ should have

used claimant's 1970 wages to calculate an average weekly wage. Id. at 67-68.

Finally, in McKnight, claimant injured his left knee loading bales in 1984. 1998 WL 461479, at *1. A doctor treated claimant for a MCL strain, and claimant returned to work. Id. In 1987 claimant's knee began to ache and swell after a "strenuous day of work." Id. In 1989 a physician diagnosed claimant with a degenerative knee condition, stemming from the 1984 workplace accident. Id. at *2 The ALJ awarded disability benefits, based on claimant's 1989 wages, rather than the 1984 wages. Id. The BRB vacated the ALJ's decision, concluding as follows: "Although the full extent of claimant's disability became manifest in 1989, the [ALJ] found, and we affirmed, that claimant's disability is the result of his 1984 work injury. As 1984 is thus the date of injury, claimant's average weekly wage must be determined at that time." Id. at *9 Petitioners also contend that McKnight stands for the proposition that the BRB adopted the reasoning of LeBlanc and General Dynamics for traumatic injury cases, such as the one at bar. Pet'rs' Mem. 10-11.

The proposition for which Petitioners' cases stand is different from the issue before this Court. Here, unlike in LeBlanc, General Dynamics, and McKnight, Respondent has not filed for disability based on a manifestation of disability

16

stemming from a workplace accident years before his claim. Rather, the ALJ merely took into account Respondent's post-injury wages (which were short in duration) in determining his earning capacity and resulting average weekly wage.

Respondent relies heavily on Tri-State Terminals, 596 F.2d 752 for his position. In Tri-State Terminals, one claimant worked as a longshoreman at a port that only operated from April to December, due to ice closing the port the rest of the year. Claimant suffered a workplace injury that kept him from working in the ice-free portion of the year. Id. at 753-54. The ALJ did not use claimant's post-injury wages to determine an average weekly wage, but the BRB reversed, holding that: "'[T]he [ALJ] should consider not only claimant's previous actual earnings during the 1973 season, but [t]he amount which he reasonably would have earned in 1974 were it not for the injury . . . .'" Id. at 754 (quoting George Barber, BRB Nos. 75-177 & 75-177A, at 8 (Feb. 25, 1976)). The United States Court of Appeals for the Seventh Circuit affirmed the BRB's use of claimant's post-injury wages in a calculation of average weekly wage, noting that: "The Board's interpretation of [Section] 10(c) thus construes earning capacity of the injured workman to mean the amount of earnings the claimant would have the potential and opportunity to earn absent injury." Id. at 757. The Seventh Circuit concluded that "the Board did not go beyond the scope of its

17

statutory authority in making its factual determination of earning capacity." Id. at 758.

Respondent also relies on the BRB's 2007 decision in S.K. v. Serv. Emp'rs. Int'l, Inc., 41 BRBS 123, 2007 WL 4282166 (Sept. 28, 2007). There, claimant worked as a laundry service worker in Baghdad, Iraq. Id. at *1. She was injured in 2004 when the driver of a vehicle in which she was riding swerved to miss a box in the road. Id. The car rolled several times, and claimant was paralyzed from mid-chest down. Id. The employer voluntarily paid her compensation based on claimant's wages from the previous year, which included claimant's time as a school teacher in Houston, Texas. Id. Claimant asserted that her compensation should be calculated based on the wages she would have earned in Iraq. Id. The BRB agreed, noting that "[t]he object of Section 10(c) is to arrive at a sum that reasonably represents claimant's annual earning capacity at the time of her injury." Id. at *3 (citing Bath Iron Works, 380 F.3d 597 (1st Cir. 2004); Empire United Stevedores, 936 F.2d 819 (5th Cir. 1991)). The BRB then concluded: "Thus, while post-injury events generally are irrelevant to the calculation of a claimant's average weekly wage, . . . consideration of post-injury factors may be appropriate pursuant to Section 10(c) where a claimant's previous earnings do not realistically reflect the claimant's wage-earning potential." Id. (internal

18

citations omitted); see also K.S. v. Serv. Emps. Int'l, Inc., 43
BRBS 136, 2009 WL 3308377, at *1 (Sept. 25, 2009) (noting in its
denial of reconsideration of its prior decision that: "The Board
held that where, as here, claimant is injured after being
enticed to work in a dangerous environment in return for higher
wages, it is disingenuous to suggest that his earning capacity
should not be calculated based upon the full amount of the
earnings lost due to the injury.").

According to the BRB's similar 2009 decision in K.S.,
factoring in post-injury overseas wages will not be appropriate
in every DBA case.   Id.   In explaining its decision denying
reconsideration, the BRB noted in K.S. that "the Board did not
hold that in every DBA case the claimant's average weekly wage
must be derived solely from overseas earnings." Id. The BRB went
on to explain:   "Rather, the Board held that the circumstances
presented in this case required that claimant's average weekly
wage be based exclusively on the higher wages earned in the job
in which he was injured in Iraq."   Id.   The BRB also noted in
K.S. that "Section 10(c) does not mandate the use of all of
claimant's wages in the year prior to injury."   Id. at *2
(citing Gatlin, 936 F.2d 819).   The BRB's decision denying
reconsideration explained this distinction as follows:   "Rather,
this subsection is written in the disjunctive, stating the
[ALJ] should have 'regard to the previous earnings of the

injured employee in the employment in which he was working at the time of the injury,' or of other employment of the employee." Id. (quoting 33 U.S.C. § 910(c)). Ultimately, the Board in K.S. concluded that the ALJ may factor in a claimant's post-injury, overseas wages when "it best reflects his annual wage-earning capacity at the time of injury."[5] Id. (citing Walker, 793 F.2d 319; Nat'l Steel & Shipbuilding Co. v. Bonner, 600 F.2d 1288 (9th Cir. 1979)).

One commentary has attempted to synthesize the various positions on this issue, organizing the cases by the approach used. Levy, supra § 9.03. Some cases consider only the overseas earnings of workers, such as Respondent, who have essentially gone to work at a higher wage in a war zone pursuant to a time-limited contract for what is likely a less than permanent job. See, e.g., Zimmerman v. Serv. Emp'rs. Int'l, Inc., 39 BRBS 166 (ALJ) (2005), aff'd, BRB No. 05-580 (2006) (unpublished). The commentary calls these the "contract wage"

---

[5] Indeed, in K.S., the BRB determined that "the use of overseas wages". . . "provides the legal framework within which the [ALJ] may exercise his discretion in determining the amount of claimant's average weekly wage." K.S., 2009 WL 3308377, at *2; see also id. at *2 n.1 ("The Act must be construed so that employees injured under the same circumstances receive equal treatment. To allow two employees who are working under the same contract and conditions, and injured at the same time, to receive different amounts of compensation because one [ALJ] relied on Iraq wages while another reduced claimant's rate by combining lower, stateside earnings, would be arbitrary.").

cases. Levy, supra §9.03[1]. Other cases arrived at the average weekly wage by taking an average of some ratio of projected overseas earnings for such workers (which are higher than prior stateside earnings) and the claimant's prior stateside wages. See, e.g., D.C. v. Serv. Emps. Int'l, Inc., 40 BRBS 889 (ALJ) (2006). The commentary calls these the "blended approach" cases. Levy, supra § 9.03[1]. The most recent cases from the BRB (including this one) involving employees who are paid substantially higher wages to work overseas than stateside, appear to have settled on the contract wage approach when it is grounded in the employee having a full time employment contract (generally one year) and being exposed to dangerous working conditions. See, e.g., K.S. v. Serv. Emps. Int'l, Inc., 43 BRBS 18 (2009), denying reconsideration, 43 BRBS 136 (2009).

On the facts before this Court, and for the following reasons, the approach adopted by the BRB in this case appears to be most consistent with the plain language of the statute. Section 10(c) provides that "the average weekly wage of the injured employee at the time of the injury . . . shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of injury . . ., shall reasonably represent the annual earning capacity of the injured employee." 33 U.S.C. § 910(c). The Fourth Circuit has recognized that "'[t]he prime objective of

[this subsection is] to assure that compensation awards [are] based on accurate assessments of the claimants' earning capacity.'" Universal Maritime Serv. Corp., 155 F.3d at 327 (quoting Tri-State Terminals, 596 F.2d at 756); see Bath Iron Works, 380 F.3d at 610 ("The essential purpose of the average weekly wage determination is to reflect a claimant's annual earning capacity at the time of the injury.") (citations omitted). Moreover, in Universal Maritime Serv. Corp., the Fourth Circuit specifically commented that §10(c) "explicitly recognizes that the mechanical formula for benefit computation [in § 10(a)] must be disregarded where the formula would distort a claimant's actual earning capacity." 155 F.3d at 327. In that case, the Court recognized that in order to accurately reflect the employees actual earning capacity, it may be necessary at times to look at post-injury earnings to accurately reflect such capacity. Id. at 328; Walker v. Wash. Met. Area Transit Auth., 793 F.2d 319, 321 ("Depending on the circumstances that necessitate the § 910(c) inquiry, it may be appropriate to look at salary rates both before and after the injury.").

While the Universal Maritime Serv. Corp. decision recognizes that there may be instances where invocation of §10(c) requires a court to consider post-injury income in order to determine an employee's average weekly wage before the

22

injury, application of that principle to the facts of this case is most easily seen in the Tri-State Terminals decision upon which the Fourth Circuit relied.

The Seventh Circuit analysis in Tri-State Terminals focused on the statutory language. 596 F.2d at 755. The employer had argued that when applying the § 10(c) statutory language--"having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury"--"the literal terms of § 10(c) explicitly foreclose consideration of post-injury earnings." Id. After applying principles of statutory construction, the Seventh Circuit concluded that the "ordinary understanding of 'having regard to' does not connote exclusivity," and therefore post-injury earnings can be considered in some circumstances. Id. The Seventh Circuit went on to recognize that the LHWCA "is a remedial statute which should be liberally construed to effectuate its purposes and in a way to avoid harsh and incongruous results." Id. at 756. After observing that the purpose of § 10(c) is to insure awards are based on "accurate assessments of the claimant's earning capacity," the Seventh Circuit went on to conclude that where an employee's earnings in the year preceding the injury are not a fair and reasonable approximation of claimant's earning capacity because such employee's annual earnings would have substantially increased

23

but for the disabling injury, it is appropriate to look at post-injury earnings. Id. at 757.

Here, the Respondent was employed to work overseas in what was essentially a war zone. He was paid substantially higher wages than he had earned stateside, and he was employed under a one year contract reflecting this arrangement. Respondent was injured after being in Iraq for only a few weeks. Despite his injury, the Respondent continued to be sent out on missions and utilized for several months before he was finally sent back to the United States for medical treatment. But for his injury, the evidence suggests that he would have fulfilled his one year contract and continued to work as he had up to the time of his return to the United States. Solely relying on Respondent's pre-injury wages fails to realistically reflect his annual earning capacity. Under these circumstances, consideration of all of Respondent's earnings in Iraq, both pre-injury and post-injury, is consistent with the language of § 10(c) and its purposes, and most accurately reflects his annual earning capacity at the time of injury.

For the reasons stated above, the Court concludes here that the ALJ acted within his discretion when he considered the exceptional circumstances involving Respondent's one-year employment contract and the dangerous environment in which he worked, and factored in Respondent's higher than stateside post-

injury wages in the average weekly wage calculation.  See Smith
v. Serv. Emps. Int'l, Inc., BRB Nos. 11-0326 and 11-0326A (Aug.
23, 2011); Proffitt, 40 BRBS 41, 2006 WL 2604890, at *4 (noting
that the ALJ has "wide discretion" when calculating an average
weekly wage under Section 10(c)) (citing Staftex Staffing v.
Dir., OWCP, 237 F.3d 404 (5th Cir. 2000); Harrison v. Todd Pac.
Shipyards Corp., 21 BRBS 339, 344-45 (1988)).   Therefore, the
decision of the BRB regarding the calculation of Respondent's
average weekly wage is **AFFIRMED** because it is based on
substantial evidence and is in accordance with the law.

### B. The ALJ's Disqualification of the Interpreter Position

Next, Petitioners assert that the ALJ erred in
disqualifying two potential interpreter positions as suitable
alternative employment.  Pet'rs' Mem. 19.  Petitioners contend
that the ALJ should have factored these positions into a
calculation of Respondent's post-injury earning capacity.
Pet'rs' Mem. 19.  Petitioners aver that "[t]he record is devoid
of any evidence that [Respondent] applied for those or any other
jobs or that he took any other actions that a person genuinely
seeking work would undertake."  Pet'rs' Mem. 19.

The United States Court of Appeals for the Fourth Circuit
has established a series of burden-shifting obligations
regarding suitable alternative employment determinations.
"First, the employee bears the burden of showing that he is

25

unable to return to his former employment." Newport News Shipbuilding & Dry Dock Co. v. Tann, 841 F.2d 540, 542 (4th Cir. 1988). This issue is not in contention in the present case, as the parties agree that Respondent is not able to return to his former employment. "Second, the employer bears the burden of showing the existence of suitable alternative employment that would be available to the claimant if he diligently sought it." Id. In this case, the ALJ found that the Employer established the availability of three positions as suitable alternative employment: portrait photographer at J.C. Penney, office pay clerk/cashier at a car dealership, and an interpreter position. Schbot, 2010 WL 4035105, at *4. "Finally, if the employer has met this burden, the claimant may still establish disability by showing that he has diligently sought appropriate employment, but has been unable to secure it." Tann, 841 F.2d at 542 (citing Trans-State Dredging v. BRB, 731 F.2d 199, 200 (4th Cir. 1984); Newport News Shipbuilding & Dry Dock Co. v. Dir., OWCP, 592 F.2d 762, 765 (4th Cir. 1979)). Moreover, "[t]he existence of suitable alternate employment is a factual determination." Del Monte Fresh Produce v. Dir., OWCP, 563 F.3d 1216, 1221 (11th Cir. 2009) (citing P&M Crane Co. v. Hayes, 930 F.2d 424, 431 (5th Cir. 1991)).

With respect to this final burden of the employee, Respondent testified that he diligently sought the interpreter

positions. Schbot, 2010 WL 4035105, at *4. Respondent stated, however, that one possible interpreter employer would have required a $1,400 certification and would have given Respondent only one-half to one hour of work every few months, translating for the courts. Id. Respondent, therefore, sought a second lead for an interpreter position but learned that this employer was seeking a Spanish interpreter, not Arabic—Respondent's specialty. Id. Therefore, the Court affirms the Board's finding that "[t]he [ALJ], thus, rationally concluded that the interpreter position identified in the labor market survey was not available alternative employment and that the wages of the job identified by [Employer] could not be used to calculate claimant's wage-earning capacity." Id.

The ALJ's determination eliminating the interpreter position as suitable alternative employment is supported by substantial evidence in the record. Accordingly, the decision of the BRB concerning this aspect of the calculation of Respondent's post-injury earning capacity is **AFFIRMED**.

### C. The Remaining Suitable Alternative Employment Positions

Finally, Petitioners assert that the ALJ erred in his calculation of Respondent's post-injury earning capacity by basing this calculation on the lowest-paying position identified as suitable alternative employment—the cashier's position. Pet'rs' Mem. 20. Petitioners contend that the ALJ should have

27

averaged the salaries of the positions identified as suitable alternative employment. Id. Instead of a post-injury earning capacity of $30,000 annually or $576.92/week, the salary of the cashier position, Petitioners believe that Respondent's post-injury earning capacity should be $842.10/week[6] or, "at a minimum" $724.69/week. Id.

The ALJ took into account the fact that Petitioners had identified the cashier and photographer positions as suitable alternative employment. See ALJ D&O 26. Yet, the ALJ only considered the salary of the lowest-paying of the positions (cashier) in his calculation, concluding that: "Considering the SAE [suitable alternative employment] available to the Claimant, I find his post-injury earning capacity to be $30,000 per year." Id. On appeal, the BRB affirmed this calculation, noting that the ALJ's "calculation of claimant's wage-earning capacity is reasonable and is based on substantial evidence of record . . . ." Schbot, 2010 WL 4035105, at *5. Neither the ALJ nor the BRB explained why the photographer position was disregarded in this calculation.

The United States Court of Appeals for the Fifth Circuit has recognized that the reasonable method for calculating an employee's post-injury wage earning capacity is to average the

---

[6]This calculation factors in the interpreter position's salary.

salaries of the positions identified as suitable alternative employment. See Avondale Indus., Inc. v. Pulliam, 137 F.3d 326 (5th Cir. 1998); Shell Offshore, Inc. v. Dir., OWCP, U.S. Dep't of Labor, 122 F.3d 312, 318 (5th Cir. 1997) (vacating and remanding because the ALJ chose the lowest salary, rather than the average, and "[t]here [was] no explanation for this decision and . . . no evidence in the record to support the ALJ's decision not to use the average"). The Fifth Circuit reasoned that employers do not have to show that a specific job opening is available when establishing suitable alternative employment, and therefore, courts have no way of determining which job the employee will obtain. Pulliam, 137 F.3d at 328 (citing Avondale Shipyards, Inc. v. Guidry, 967 F.2d 1039 (5th Cir. 1992)). "Averaging ensures that the post-injury wage earning capacity reflects all jobs available." Id.; see also Greenwich Terminals, LLC v. OWCP, 309 Fed. Appx. 658, 666 n.8 (3d Cir. 2009) (noting that averaging salary ranges of suitable positions to calculate post-injury wage-earning capacity was "reasonable and within the administrative law judge's substantial discretion on the issue").

The BRB has embraced this logic in other cases. See Harris v. Elec. Boat Corp., BRB No. 10-0287, 2010 WL 4035103, at *3 (Ben. Rev. Bd. Sept. 3, 2010); B.H. v. Northrop Grumman Ship Sys., Inc., BRB Nos. 09-0198 & 09-0291, 2009 WL 3159148, at *4

(Ben. Rev. Bd. Sept. 16, 2009); L.N. v. KBR Gov't Operations, 41 BRBS 1384, 2008 WL 510093, at *32 (Office of Admin. Law Judges Jan. 9, 2008) (calculating employee's post-injury earning capacity based on average of salaries of positions identified as suitable alternative employment). In Harris, the BRB affirmed the ALJ's calculation of claimant's post-injury earning capacity using the average of three positions identified as suitable alternative employment, noting that such method "is rational and in accordance with law." 2010 WL 4035103, at *3. In B.H., the BRB remanded because the ALJ took an average of the lowest and highest-paying positions identified as suitable alternative employment. 2009 WL 3159148, at *4. Instead of such calculation, the BRB concluded that the ALJ should have taken an average of the eight positions identified as suitable alternative employment to "reflect a true average of the potential wages." Id.

Here, since no explanation was given by the ALJ or BRB for disregarding the photographer position in the calculation of post-injury earning capacity, it is difficult to find that the decision is rational and in accordance with the law. Had the ALJ provided a reasonable rationale for the calculation, the Court would find such conclusion to be supported by substantial evidence in the record considered as a whole. However, in the current case, unless there was some unstated rationale for

relying on the lower-paying position, it appears that the best way to determine Respondent's post-injury earning capacity is to average the salaries of the cashier and photographer positions. Accordingly, the BRB D&O calculation is **VACATED AND REMANDED** for proceedings not inconsistent with this opinion.

### V. ATTORNEY'S FEES

Respondent has made a request for attorney's fees.[7] Resp't's Mem. 14. Attorney's fees may be awarded to a successful claimant in LHWCA cases (and by extension DBA cases).[8] Newport News Shipbuilding & Dry Dock Co. v. Holiday, 591 F.3d 219, 226-27 (4th Cir. 2009) (citing 33 U.S.C. § 928(a)). When an attorney successfully represents a claimant in a LHWCA case, "there shall be awarded . . . a reasonable attorney's fee against the employer or carrier in an amount approved by the deputy commissioner, Board, or court, as the case may be." 33 U.S.C. § 928(a). The Supreme Court has determined that for a statutory fee-shifting provision, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckhart, 461 U.S. 424,

---

[7] Respondent seeks attorney's fees under 33 U.S.C. § 908. Resp't's Mem. 14. It appears that the proper section for seeking attorney's fees is 33 U.S.C. § 928.

[8] Nothing in the DBA alters the provisions of the LHWCA concerning attorney's fees.

31

433 (1983); see Grissom v. The Mills Corp., 549 F.3d 313, 320 (4th Cir. 2008). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." Hensley, 461 U.S. at 433.

Respondent requests that the Court allow him thirty (30) days to file a fee petition. Because Respondent's attorney must seek his fees separately at each level of the proceedings, he may file his fee petition for work performed in this Court within thirty (30) days of this Opinion and Order. Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP, 594 F.2d 986, 988 (4th Cir. 1979) (citing 20 C.F.R. § 702.132).

## VI. CONCLUSION

For the reasons set forth above, the Court: (1) **AFFIRMS** the decision of the BRB concerning Respondent's average weekly wage, (2) **AFFIRMS** the BRB's decision regarding the disqualification of the interpreter position as suitable alternative employment, and (3) **VACATES** the BRB's calculation of Respondent's post-injury wage earning capacity and **REMANDS** for further proceedings consistent with this Opinion and Order.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/ Mark S. Davis
Mark S. Davis
United States District Judge

Norfolk, Virginia
December 2  , 2011